This is 410-0009, People v. Anthony Gay, for the appellate Mr. Main, for the appellate Ms. McClain. You may proceed. Good morning, Your Honors. May it please the Court. My name is Scott Main, and I'm based on a substantial showing of multiple constitutional violations. We are asking this Court to revand the matter for an evidentiary hearing. Anthony Gay entered the Illinois Department of Corrections at the age of 20 to serve a seven-year sentence. It's now 17 years later, Anthony is 37 and faces spending the rest of his life in jail without the possibility of release. Today, this Court has the opportunity to examine whether something went wrong in either our court system or our system of corrections, where manifestations of mental illness, which were treated internally as disciplinary infractions, became 21 separate criminal charges, where delays of 34 months were used to gain tactical advantage in prosecuting those charges, and where Anthony's seven-year sentence has become 108 years, all of which to be served, almost all of which to be served in segregation. There are two questions that could be answered in an evidentiary hearing that would dictate whether Gay's functional equivalent of a life sentence would violate or does violate the Eighth Amendment. First, the Circuit Court can decide whether the conditions of his incarceration have led to his decompensating and whether his actions during the 10 months at Pontiac Correctional Center can be linked to his mental illness. Second, in light of Graham v. Florida and Atkins v. Virginia, the Court can determine whether the additional 97 years of incarceration was unconstitutional in light of the nature of the offenses, the One of the things that strikes me about this case is the very fact that we're still having a conversation about whether or not Mr. Gay suffers from mental illness. If anything, again, we believe that's why this matter should be sent to the third stage, where independent evaluations could be done to... There have been so many of these cases I get mixed up as to which one is which, but in one of the cases, didn't counsel request a fitness hearing? There were multiple cases... And didn't your client object to that? He has objected to that. Sometimes counsel was appointed on a certain case, but he was not appointed on other cases, and counsel was then sort of acting beyond the scope of his current representation to request a fitness hearing in multiple actions, without Anthony being able to actually object to the need for that fitness hearing. Well, so is this one one where I thought that's part of the basis for the appeal, where he did ask for a fitness hearing, and that delayed the proceeding? Am I correct? Well, one of the arguments in the brief, one of the contingencies he has here at his PC is that it was in April of 2004, and in March of that month, he had argued and litigated a motion to dismiss based on the speedy trial violation. And the court indicated that we have an imposed sentence on the first case for that demand period, and it's only once that first case sentence was imposed that the 160 days would start to run. That was in March. In April, Anthony was able to, or they proceeded the trial on two separate cases, one I think on the 12th of April and the other on the 13th. He was able to litigate both those cases pro se, acting as his own counsel. And then it was two weeks later where the court then made a determination that he was going to, it questioned his fitness again, and ordered a fitness evaluation on all of those cases, which told the statutory period, of course, for his demand cases. And so he argues that the trial court abused its discretion in ordering that fitness evaluation when, based on no new information, he had allowed Anthony to represent himself to trial on the 13th, but then two weeks later determines that he's questioning his fitness. So you question his fitness? I think that there remains an overarching question as to whether or not he should, I mean, one, fitness for trial and severe mental illness are actually two different considerations. One can have severe mental illness and still be deemed fit to stand trial. I think that there is taking a step back. Is there a larger question as to whether or not he should have been able to represent himself on these 17 plus matters that he was able to try the case himself? That question is not specifically in front of this court. I know that that was attempted to be raised in a separate amicus brief. But I do think that there remains an overarching question as to whether or not there's something fundamentally questionable about allowing him to proceed where, again, really, you know, we see time and time again why this was against his interest. But assuming that the court was acting, you know, using its discretion in allowing him to proceed pro se to trial on the 12th and the 13th of April, we do think that it was an abuse of discretion then to order a, I do believe that it was an abuse of discretion then to order a fitness hearing knowing that Anthony is actively litigating his motions to dismiss based on his statute of limitations for the that, you know, that this fitness hearing is then ordered, which then delays everything for over a year before the clock actually starts running again. Actually, it delayed it for over a year and then it wasn't for another four months beyond that until they finally imposed sentence on that first case. So there was a lot of situations which were operating to, excuse me, to prevent him from exercising those rights for speedy trial. But specifically in terms of this Eighth Amendment question, I mean, I think that it's time that we actually start to look at whether or not the definitions from Graham, the definitions from Atkins should be extended to embrace individuals with severe mental illness. And we're not just looking at that as a simple statement of what the categorical class is. It's situations where the severe mental illness for inmates with severe mental illness whose conditions of confinement lead to additional convictions based on conduct that's symptomatic of that illness. That's the specific question that could be addressed in the first question that needs to be handled at an evidentiary hearing. Is this a class that needs inmates that go in on a seven-year sentence and because of the mental illness that they may already have or mental illness that in this instance we feel was specifically exacerbated by the conditions of TAMS, by the conditions in the segregation of Pontiac, that lead to long, like not just a losing your good time credit, but actually gaining convictions, adding 17 or adding 16 convictions with a total of 97 additional years? Assuming for the moment that this is, well, not assuming, this clearly is an issue, may well be, and may be the problem, may be the override. How do we reach it in this context in the sense that what is there in the record and what is there in the record that we can actually look at short of taking some sort of judicial notice of everything that's ever happened to Mr. Gay that shows that he's mentally ill? And if the record shows that he's mentally ill, the record in turn would cause the trial judge to have, could have a bonafide doubt about the defendant's fitness to stand trial or fitness to be sentenced. And I understand there's clearly a distinction, but there's an overlapping of the question of diagnoses and the question of an So I don't, if I have sympathy for your argument, do I get to reach it in the context of this case? We absolutely think that you can. Obviously, first principle in post-conviction proceedings is that this court is to liberally construe the post-conviction appliance. The only way this Eighth Amendment challenge makes sense is to look at the cumulative effect, to look at the entirety of the proceedings that were based on these 10 months at Pawneer. His PC petition specifically refers to the sentences. It specifically refers to the cumulative 97 years. I think his petition said 95, but I believe it's 97. So all of these things speak to the fact that the entirety of his sentence is in front of this court to be able to reach. Now the question... In every case where there are repeat offenses, perhaps not as many as Mr. Gay's, the backdrop to those is that prison sentences are harsh, conditions at places like Pawneer are inhumane in the colloquial parlance. But the question then becomes, how does one examine that from the legal perspective? It's a lot different than mental illness in a case where it's been diagnosed, or developmental disability in a case where it's been diagnosed and you've got on the record, this is an individual that is unable to function. You've got sub-average intellectual functioning, and there's a diagnosis for it. It's established, and that's in a pre-sentence report. How was this guy ever fit to go to trial, or how was he ever fit to plead? That raises that issue. Here you're asking us, aren't you really asking us to look at his behavior and say, and the consequences of that behavior, and say not only that there's something wrong, but that you know and are able to persuade us that we precisely what's wrong? Well, obviously I think that I would begin to say yes. Going beyond that point, I would argue that one, courts have always been situated to make these types of determinations. And while the question is easier when you're just looking at juvenile, all right, clear, 18 and under, we're in a situation of mental retardation. We have a clear understanding that you can look to an individual's IQ. But once we get into that question of mental retardation, even then, there's a subjective analysis that's going on in court when reviewing it. We have standards in our guilty but mentally ill that would sort of begin to provide some information about how this type of evaluation, or what a court could be where an evidentiary hearing could very well provide you a better record to make these types of determinations. So a third stage evidentiary hearing and a post-conviction petition, you would be able to address the question of whether, what, the trial court abused its discretion because it did not consider him guilty but mentally ill? Well, not specifically that question, but I think that because we're not, at the end of the day, with specifically speaking to the 8th Amendment violation, we're not specifically challenging an individual conviction here, an individual conviction there. What we are looking to is the cumulative impact when these convictions, which we believe are directly attributable to manifestation, symptomatic behavior of severe mental illness, when that occurs within the correctional setting, when these convictions are spurred by, it's a horrible, vicious cycle where someone whose mental illness prevents them from, you know, according themselves in the manner that a sane, rational individual would do in that situation, we're placing them in a situation where they cannot succeed, where they are doomed towards failure. And so we then criminalize these mental illnesses as opposed to looking to a question or a manner in which we can still punish or, you know, side with the need within the institutional or correctional institutional setting to, you know, have rules and thus follow these rules, but there are manners in which we can look to provide treatment that is directly related to those offenses. I understand this is sort of a long-winded response to what you're saying, but I think at that evidentiary hearing, we can be beginning to have, we can be making that showing that because these convictions are linked to the diminished capacity, because these convictions are manifestations of severe mental illness, when the cumulative impact puts this individual in a situation where he now faces life without parole, there's an Eighth Amendment question that needs to be addressed. And so that's where we think the record could be developed, and it wouldn't only have to be developed in a PC, in a post-conviction setting, but here it's the PC setting is uniquely situated because we believe you can take that step back and actually look at everything that has happened in this, in these series of cases, and sort of with finality, try to provide a clear determination as to whether or not this, you know, this small subset of individuals within the correctional setting, this is not in any way, I think, a floodgates this is a small individuals whose criminal activity or whose manifestations of mental illness are being treated simply criminally as opposed to therapeutically within the... I thought you said that these were caused by conditions at TAMS and Pontiac, so that sounds to me like you're saying this applies to everybody. Well, it's when you have individuals who are housed at TAMS and housed in the certain, you know, the solid steel door segregation of Pontiac where, who already have these, this, I mean, obviously individuals at TAMS succeed. It's people from TAMS have stepped down and moved into other institutions. Some folks at TAMS have been released. Some people at Pontiac succeed and are able to comport themselves within the regulations that are there, but there are certain individuals whose mental illness, this allows them the opportunity to be able to comport themselves in the manner in which they're not, you know, receiving disciplinary infractions, where they're able to follow the rules and we're not looking for an excuse for this behavior, but we're looking for a realistic view as to whether or not, and that's where the evidentiary could allow to answer these types of questions, whether or not this behavior was actually a manifestation of mental illness that's been exacerbated by his time spent at TAMS and then his time spent in continued segregation at Pontiac. One thing that sort of tips, tips I believe in Anthony's favor is that we do have his records from his time at Dixon. When he was placed in Dixon Psychiatry Unit, when he had stepped down from TAMS into Dixon, he actually was succeeding in that environment. In a therapeutic setting, he was finding the ability to comport himself because he was receiving the treatment that he needed. It was then when he was placed back in Pontiac where those services were not provided that the mental illness again was brought to the criminal prosecutions. There's this instinct I think with Anthony's cases to sort of throw your hands, what can we do? But I don't think that we have to simply step back and allow this to occur. And I think that Graham has provided the opening that we can now begin to question whether or not where individuals whose significant or severe mental illness within a correctional setting leads them into a position where it's not just disciplinary interactions, there's critical charges. Graham dealt with juveniles? Graham dealt with juveniles. And you would like to expand that to apply to not mentally ill people but mentally retarded people? Well, Atkins has already done mentally retarded people. I mean, I think that there's a natural interplay between Graham and Atkins that categorical treatment for mental retardation is already in place. The extension that we're arguing for is that it's individuals with severe mental illness whose conditions of confinement has led to additional convictions based on conduct which is symptomatic of that severe mental illness. That's the expansion of Graham that we think it's time that this court starts to look to. Because it's invariably, it's placed him in a position where now he's facing life without parole and Graham, again, the concept of Graham and why we think it lends itself well to this argument is it was questioning twice diminished moral culpability because it's a non-homicide offense. And if I can finish, Your Honors? You may. Because it's a non-homicide offense and it's an individual who's, as a juvenile, has diminished capacity and therefore lesser culpability. Here we have a series of relatively, although disgusting, minor offenses by an individual who clearly has diminished capacity and to simply now treat this as a crime as opposed to a manifestation of our illness, we think there should be some meaningful opportunity for parole. Thank you. We'll hear from you on rebuttal. Thank you. May it please the Court, Counsel. My name is Linda McClain and I represent the State of Illinois. First of all, I would like to object to the following of the amicus briefs by the ACLU and Dr. Terman. My office only received them last Monday. I would assert they're untimely, raise new issues, and start from the premise that defendant is seriously mentally ill, which is refuted by the record. On the subject of the brief filed by OSAD, the State is asserting that defendant has not made a substantial showing that his sentence violated the Eighth Amendment prohibition against cruel and unusual punishment. At the second stage, all factual allegations that are not positively rebutted by the record are accepted as true. Defendant's petition and supporting materials do not demonstrate a deteriorating mental condition brought on during his time spent at TAMS and in segregation at Pontiac. Therefore, defendant has not established a natural infirmity which places him in a less culpable category. At this stage, it's defendant's burden to put all of his allegations in the petition and reviewing it. He doesn't even come close to warranting an evidentiary hearing. Defendant was diagnosed repeatedly with personality disorders, antisocial, narcissistic, and borderline. He was not diagnosed with any major mental illness. The crimes he committed were, by his admission, to force a transfer back to be with the psychologist he had fallen in love with, or to cut himself repeatedly at TAMS in order to force a psychologist to see him. Plainly, he is clearly just manipulative and does not warrant a third stage review. Defendant argues that Graham should be extended to him as he is seriously mentally ill. However, the record refutes this and this is not a case in which to extend Graham. Graham addressed the issue of life without parole as it applied to juvenile offenders. Graham has not been extended beyond the age category in non-death cases. I would argue that age is black and white, mental health depends on the individual, and varies in degree. Also, defendant's petition and supporting materials do not link his condition of confinement to a mental condition. The law review articles cited do not conclude that all prisoners in solitary confinement or segregation are mentally ill or that any antisocial behavior in prison is a result of this mental illness. Also, these articles were not introduced at the trial level and are refuted by the record, which shows that defendant manipulated the system to achieve his goals, not that his conduct was a result of a mental illness or his conditions of imprisonment. Hasn't defendant in effect received a life sentence for some relatively minor offenses? When all the sentences are added together, he's going to be there for a long time. 97 years, isn't that a life sentence? Technically it would be a life sentence. And isn't that a problem? He does not fit within Graham and he doesn't fit, it's not a death penalty case, so that category doesn't apply and Graham has not been extended to anything beyond the juvenile. So it might not make sense, but there hasn't been any case that warrants stepping in? There's not been any case that warrants stepping in and Graham should not be extended in this case because he's not been, according to the petition and the attachments, he's not mentally ill, he's not seriously mentally ill, he has multiple personality disorders and he manipulates the system. What about Atkins? That involved people who exhibited abnormally diminished intellectual functioning? That case held that the death penalty should not apply to mentally retarded. The death penalty cases have been kind of considered on their own. So that only applies to death penalty and not life imprisonment? Yes. The other issue my opponent addressed in argument was whether the appellate counsel was ineffective for failing to argue that the trial court circumvented his speedy trial rights by ordering a fitness examination. The state would assert that the defendant cannot complain of an error that he induced the trial court to make. Defense counsel urged the court to order the fitness examination that now serves as the basis for his speedy trial argument. While the defendant argues that defense counsel did not represent him in this case, he did represent him in several other cases and the hearing on that date encompassed all of the defendant's cases. If the court ordered a fitness hearing in one it was going to apply to all of them. The trial court properly exercised its discretion in ordering this fitness exam. The court was able to see and evaluate the defendant and even defense counsel urged the court to have defendant examined again in view of his actions during the last jury calendar. The state maintains that this was a matter of discretion and that the court did not abuse its discretion here. Also this precise issue has been addressed by this court in a different case and in that case this court found that the contention was meritless and defendant could not complain of an error he induced the trial court to make. Are there any other questions? We'd ask support to affirm the trial court and deny it on evidence you're hearing. Thank you counsel. Rebuttal, Mr. Mayne. Thank you, I have a few brief questions. The state, you know, again the state draws this attention to this concept of manipulative behavior and obviously that was something that shows up in many of the internal mental health evaluations that were done by correctional staff.  Whatever internal impetuses there might be in terms of seeing something as manipulation as opposed to seeing something that actually deserves and merits treatment. I think again the notion of manipulation should not be the end of the conversation. Many prisoners suffer from serious mental illness and feel a need to manipulate in order to get the treatment that they need. There's a vicious cycle that's going on. The more insufficient that the mental health services are within a facility and when you look to the numbers of inmates and segregation of Pontiac inmates, I mean that's our long-term segregation facility in Illinois. And so we have probably over a thousand inmates all dealing with, I speculate in terms of the number, but we have a large number of inmates in need of mental health services and very few treatment providers that are there. So the more insufficient that we have in terms of our mental health staff who are denying services to those who they feel are just simply being manipulating, the more the truly mentally impaired inmate is forced to manipulate in order to get the care that he needs. And too often mental health staff and I think the courts too can see this as an either-or proposition,  and that's to ignore the realities of the specifics of inmates and dealing with the need to receive the care and attention that they deserve. But again, thinking of our time at TAMS, or thinking of an individual's time at TAMS, there's absolutely no human interaction. The only time you're allowed human interaction is when you're seeing your therapist. And so the self-mutilation, the acting out in order to receive that attention, to receive that therapeutic setting, I think is easily understood. It doesn't end the conversation as to whether or not this is mentally ill, because again there's a rational way to try to receive this behavior or receive this treatment. And then there's the manner in which an individual with severe mental illness would engage in that conduct. Let me ask a question. There was a fitness hearing sometime after that April date. Would that have been 2004 or 2005? 2005 there was. So by 2005, a substantial portion of that behavior, which the state would say was manipulative and acting out to get what he wanted. His period at TAMS, his period at Dixon, his period during a 10 or 11 month period at Pontiac, where it appears from the record that he even announced or indicated the reasons he was doing his various things were to try to get transferred back to TAMS. So what did the evaluator say at that point? There's the earlier diagnoses of substantial personality disorders, not otherwise specified, but not diagnosed under the DSM-IV. Okay, but how about then? What did that fitness evaluation show? They were consistently showing the access to antisocial personality disorder and narcissistic personality disorder. But falling short of a diagnosis of a specific mental illness. Well, again, that's what his diagnosis was, but he felt within that diagnosis, this individual was still fit to stand trial. But that diagnosis didn't establish that he had a recognized... Well, those are recognized access to, within the DSM-IV, they're the antisocial personality, narcissistic. These are diagnoses. It's just whether or not it's access one diagnosis or access two. And even within TAMS' own internal regulations or administrative directive, there is a manner in which that level of antisocial personality disorder can be elevated to an access one. And I think that that's one of the reasons an evidentiary hearing could be beneficial here, because there's a disincentive within internally to provide that access one diagnosis. But if an independent evaluation could be done to determine whether or not that individual falls within the access two range or the access one, would provide a clear explanation that this is a severe mental illness that disallows the individual from reporting. I see that my time's up. Can I quickly conclude? Briefly. Again, just for the reasons they've been our briefs and for reasons spoken up here today, we believe that there is a strong need to remand this for an evidentiary hearing. Thank you, Mr. Chancellor. We take the matter under revised.